**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.:  24-22714-Civ** **(                    /                    )**

**QC TRADE GROUP, LLC, a**
**Florida limited liability company;**
**SOPHIA GRUTTSHENKA**
**LACAYO SIERO, an individual;**
**and ANA MARIA SIERO SILVA,**
**an individual,**

      **Plaintiffs,**

**vs.**

**DASH ADVANCE, LLC, a**
**New York limited liability company;**
**ALEX ROSENBERG a/k/a ALEX**
**ROSSENBERG, an individual;**
**JOHN DASH, an individual, and**
**ELIYAHU TZVI COHEN, an**
**individual,**

      **Defendants.**
_____/

**<u>COMPLAINT</u>**

    Plaintiffs, QC TRADE GROUP, LLC ("QC"), SOPHIA GRUTTSHENKA LACAYO

SIERO ("Ms. Lacayo"), and ANA MARIA SIERO SILVA ("Ms. Silva")(collectively, "Plaintiffs"),

file this Suit against DASH ADVANCE, LLC ("Dash"), ALEX ROSENBERG a/k/a ALEX

ROSSENBERG ("Rosenberg"), JOHN DASH ("JD"), and ELIYAHU TZVI COHEN

("Cohen")(collectively, "Defendants").

1

**INTRODUCTION**

1.  This is an action for damages, arising from an agreement between the parties from different states, for violation of Chapter 687, Florida usury law; 18 U.S.C. §1961, et seq. Rackateer Influenced and Corrupt Organizations Act ("RICO"); Chapter 895, Florida Racketeer Influenced and Corrupt Organization Act (Florida "RICO"); Federal Civil Conspiracy; State Civil Conspiracy; Chapter 501, Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"); Breach of Contract; Fraud in the Inducement; Common Law Fraud; Negligent Misrepresentation; Tortious Interference with Advantageous Business Relationship; Chapter 542, Florida Antitrust Act of 1980, Combinations Restricting Trade or Commerce;  and 15 U.S.C. §§1, et seq. Sherman Act.

**PARTIES, JURISDICTION AND VENUE**

2.  Plaintiff, QC Trade Group, LLC, is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

3.  Plaintiff, Sophia Gruttshenka Lacayo Siero is an individual, residing in Miami-Dade Couty, Florida.

4.  Plaintiff, Ana Maria Siero Silva, is an individual, residing in Miami-Dade County, Florida.

5.  Defendant, Dash Advance, LLC, is a New York limited liability company, with its principal place of business in the State of New York.

6.  Defendant, Alex Rosenberg, is an individual, residing in the State of New York, and is *sui juris*.

7.  At all times material hereto, Rosenberg was a senior partner of Dash.

8.  Defendant, John Dash, is an individual, residing in the State of New York, and is *sui juris*.

9.  At all times material hereto, John Dash was an executive and/or owner of Dash.

10. Defendant, Eliyahu Tzvi Cohen, is an individual, residing in the State of New York, and is *sui juris.*

11. At all times material hereto, Eliyahu Tzvi Cohen was an executive and/or owner of Dash.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees, and is an action between citizens of different states.

13. This Court also has jurisdiction pursuant to 18 U.S.C. § 1964(c) because Plaintiff has asserted claims under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and 15 U.S.C. §§1, et seq., Sherman Act.

14. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because (1) Defendants operated, were present, and/or did business within the State of Florida, Miami-Dade County, (2) Defendants' illegal conduct occurred, among other places, within the State of Florida, Miami-Dade County, and (3) the transaction giving rise to this action took place within the State of Florida, Miami-Dade County.

## GENERAL FACTUAL ALLEGATIONS

15. Dash was established on November 21, 2023, according to the Department of State, Division of Corporations of New York.

16. QC was established in Miami-Dade County, Florida and was in need of new capital to help its financial condition toward the end of 2023.

17. On or about December 7, 2023, Dash and QC entered into an agreement whereby Dash offered to provide QC with $100,000 as the purported purchase price for future receivables of QC in the amount of $149,000, allegedly representing 20% of its future receivables, paid to Dash in

daily installments of $2,142 until the total purchase of $149,000 was satisfied.  **See Composite Exhibit "A."**

18. Dash deceptively titled the agreement as "Purchase and Sale of Future Receivables," although in practice and substance performed the transaction as a high interest usurious loan.  This loan created an unlawful debt.

19. Dash intentionally misled QC to believe that it would receive the benefit of $100,000, the amount that QC bargained for and expected to receive, but instead paid QC only $50,000 on December 11, 2023.  Dash immediately commenced transacting ACH debits from QC's bank account on December 11, 2023, and refused to deposit any further funds in QC's account as required by the agreement.  QC never received the $100,000 it was to receive under the terms of the agreement.

20. After extensive discussion and multiple demands by QC, Dash made a second deposit of $30,000 more than six (6) weeks later on January 24, 2024, and after having debited $62,118 from QC's bank account.  At no point in time did or has QC received the $100,000 that it bargained for.  Within one (1) month, Dash had already debited in excess of the initial $50,000 it had provided QC, and continued to debit QC's account while QC continued to ask for the remaining funds it had not received.

21. By the time as of January 24, 2025 when Dash eventually paid an additional $30,000 into QC's bank account, Dash had already debited $62,118 from Plaintiff's bank account on the basis of a fraudulent, illegal and unenforceable contract.

22. Dash deceptively worded the agreement as if it were a purchase and sale of assets, and misrepresented it as such, however, the agreement has all the earmarks of a loan instead.

a.  The agreement provides for fixed payments upon which the total balance owed would be paid, thus creating an implied definite term.

b.  The fixed daily payments did not represent a good faith estimate of purchased percentage multiplied by revenues of Merchant, but instead represented a fixed amount aimed at receiving a full intended balance of principle and usurious interest within a certain time period unilaterally determined by the Defendants.

c.  The agreement included a personal guarantee, which eliminated the risk transfer that occurs in a merchant cash advance agreement, as opposed to a loan.

d.  The agreement provided rights to Dash to collect the total amount of the receivables purchase, even if the merchant was unable to pay due to insufficient receivables, by allowing various judicial and extrajudicial remedies for Dash, further eliminating the risk transfer that occurs in a merchant cash advance agreement, as opposed to a loan.

e.  The agreement included secured collateral for the amount of the receivables contemplated by allowing collection through assets above and beyond the specific asset of the sole receivables bargained for.

f.  The available remedies set out in the agreement render the repayment as absolute and at all events, and again eliminate the transfer of risk that occurs in a merchant cash advance agreement, as opposed to a loan.

23. As a loan, based on the $100,000 loan amount on the face of the agreement, and the total balance due for repayment, at a rate of $2,142 per day, the effective interest rate is in excess of 950%, rendering it a usurious loan.

24. Although the agreement purports to exclude bankruptcy as a breach of the agreement or a default, those terms are illusory, as Dash's right to collect the full amount of the debt is protected in its security interest upon the assets as a whole of QC, as well as it's recourse against the guarantor directly for the full balance of the purchased amount.

25. The language of the agreement purporting to state that it is not a loan is illusory, as there is:

    a.  no risk transfer; there is a right of immediate acceleration of the loan upon default, including remedies to collect on the full amount irrespective of the receivables that have yet to be collected;

    b.  there is a security interest in assets that are outside, above and beyond the corpus of the receivables;

    c.  the agreement provides recourse against the guarantor for the full amount of the purchased amount beyond what is actually receivables;

    d.  the purported reconciliation provision is a sham and ineffectual as it only provides for a reconciliation request once per month despite ACH debits being required on a daily basis, all but setting up an event of default triggering full acceleration of the loan.  The provision was mere subterfuge to avoid usury laws;

    e.  the agreement is based on a finite term resulting from a payment schedule of a specific daily remittance that remains unchanged, and is calculated at the time of the agreement by what the Defendants term, albeit falsely, as a good faith purchase percentage multiplied by QC's revenues, until the full "purchased amount" is paid. The calculation is made with the intent that the debt would be paid within a certain period of time.

f.  Dash's right to collect the full purchased amount is absolute, and not contingent upon actual receivables.

26. Dash and its principal(s), Cohen, JD, and senior partner, Rosenberg, perpetrated a fraudulent scheme to establish and operate a business with the purpose of enticing and giving loans under false pretenses and deceptive practices, disguising loans as merchant cash advances, titled as Purchase and Sale of Future Receivables agreements, charging usurious interest rates, and engaging in predatory, unlawful and deceptive business practices.  In fact, to attract small businesses encountering financial hardship, the Defendants' advertising puts them out as lenders, offering high risk lending.

27. Dash, Cohen, JD, and Rosenberg, comprise an enterprise or association of individuals and a corporate entity that furnish a vehicle for the commission of a pattern of racketeering activity.

28. The three Defendants engaged in business practices with the purpose of earning revenues from their false, fraudulent, misleading, deceptive, and illegal representations regarding loans disguised as purchase and sale of future receivables, in order to avoid usury laws.

29. The Defendants engaged in strong arm and extortive tactics in attempting to collect on an illegal debt.

30. The Defendants intentionally misrepresented the true nature and character of the agreement between the parties as a purchase of future receivables instead of a loan, in order to inconspicuously charge unlawful usurious interest.

31. The Defendants knew or should have known that their agreement with the Plaintiffs was a loan, and not a sale and purchase of future receivables agreement.

32. The Defendants unlawfully retained a portion of the proceeds due to QC at the inception of the agreement, without consent, in violation of the terms of the agreement.

33. The Defendants affirmatively made false statements and misrepresentations throughout the agreement in order to entice and influence the Plaintiff's to enter into the subject agreement.

34. The Defendants knew or should have known that their representations would be relied on by the Plaintiffs in entering into the subject agreement.

35. The Plaintiffs reasonably relied on the Defendants' misrepresentations made throughout the agreement, which was entirely and unilaterally drafted by the Defendants, before entering into the subject agreement.

36. The Plaintiffs acted in reasonable reliance on the Defendants' misrepresentation to the Plaintiffs' detriment.

37. The Plaintiffs were injured by the acts of the Defendants, and have incurred damages thereby.

## COUNT I

### Violation of Florida Usury Law, Chapter 687, Fla. Stat.

38. Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

39. Defendants provided a loan in the principal amount of $100,000, to be paid back in daily installments of $2,142, until a total payoff balance of $149,900 is satisfied (essentially 3 months), resulting in an interest rate in excess of 199.5% annual percentage rate.

40. To the extent other charges, such as the excessive "Origination Fee" which had no basis in fact, and instead can be construed as additional interest, the annual percentage rate may even be higher than stated in Paragraph 39 herein (between 305-456% annual percentage rate ).

41. The interest rate on the subject loan was in excess of 18% per annum, the legal rate of interest pursuant to § 687.02, Fla. Stat.

42. The interest rate imposed on the subject loan was usurious, and violated Chapter 687, Fla. Stat.  This loan created an unlawful debt sounding in tort.

43. Whether the claim for Usury stands as a claim in contract or tort is a matter of fact to be determined by the trier of fact.

44. The debt upon the Plaintiffs was incurred in connection with the business of lending money at more than the legal rate of interest.

45. The Defendants caused the collection of the debt by various debits from Plaintiff, QC's, bank account, and by subsequently attempting to collect from the guarantors.

46. The Defendants acted knowingly, willfully, and unlawfully.

47. Defendants are liable to Plaintiffs for damages, due to Defendants' unlawful usurious loan to Plaintiffs, charging interest in excess of that allowed pursuant to Chapter 687, Fla. Stat.

48. Plaintiffs have incurred attorneys' fees and costs as a result of this action.

49. Plaintiffs are entitled to attorneys' fees pursuant to § 687.147, Fla. Stat.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for civil damages, punitive damages, interest, costs, attorneys' fees, and any further relief the Court deems just and proper.

## COUNT II

### Violation of 18 U.S.C. § 1961, *et seq*., Racketeer Influenced and Corrupt Organizations Act ("RICO")

50. Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

51. At all times material hereto, all Plaintiffs and Defendants are natural persons and corporate entities, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

52. At all times material hereto, Dash was a legal entity, and together with Cohen, Rosenberg and JD formed an "enterprise" within the meaning of 18 U.S.C. § 1961(4), working together formally or informally to commit the acts alleged herein.

53. The "enterprise" had a common purpose of earning revenue through their false, fraudulent, and illegal representations regarding the loan provided to QC, under the guise of a merchant cash advance, deceitfully titling the subject agreement as a "Purchase and Sale of Future Receivables," when it was actually and in substance a loan.

54. The enterprise engages in the practice of providing loans to small businesses that are seeking capital funding, and disguising the loans as merchant cash advances, while syphoning exorbitant interest rates at unlawful and usurious rates.

55. The Defendants' practices are aimed at avoiding usury laws from different states, while employing predatory lending practices and benefiting therefrom without a transfer of risk.

56. In furtherance of the deceitful and fraudulent acts, the Defendants included a choice of law clause in the loan document naming Connecticut law, which has favorable laws for the Defendants regarding usurious interest rates, despite Connecticut having no logical connection or nexus to the parties who are from New York and Florida, or to the transaction in this case which all revolves around Florida, to wit: executed by the Plaintiffs' in Florida, banking transactions, including debits by the Defendants, all occurring from a Florida bank account, the initial deposit from the Defendants being made into a Florida bank account.

57. The Defendants' intentionally, and maliciously frame their agreements in such a way as to avoid liability for usury, with the intent of charging usurious interest rates which in New York and Florida would be usurious.

58. The Defendants also intentionally and maliciously cloak their agreements as merchant cash advance agreements, when the substance of the agreements create a loan, as part of a scheme to keep the agreements out of the reach of Usury laws and deceive the borrowers such as Plaintiffs' herein.

59. The Defendants' engage in the lending practices in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding consumers, including Plaintiffs, and collecting on an unlawful debt.

60. The Defendants employ false representations, fraudulent conduct, and deceptive business practices in procuring loans clothed as merchant cash advances, and then use strong arm and extortive tactics to collect on the unlawful debt.

61. In further deceptive practices to prey on and attract small businesses that are encountering financial hardship, the Defendants' advertising puts them out as lenders, offering high risk lending.

62. The Defendants all collectively participated in the enterprise through a pattern of racketeering activity, including but not limited to, the rendering of usurious loans and collection thereon.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for civil damages, treble damages, punitive damages, interest, costs, attorneys' fees, and any further relief the Court deems just and proper.

## COUNT III

### Violation of Chapter 895, Florida Statutes, Florida Racketeer Influenced and Corrupt Organization Act (Florida "RICO")

63. Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

64. At all times material hereto, all Plaintiffs and Defendants are natural persons and corporate entities, and as such are "persons" within the meaning of Chapter 895, Fla. Stat.

65. At all times material hereto, Dash was a legal entity, and together with Cohen, Rosenberg and JD, formed an "enterprise" within the meaning of § 895.02, Florida Statutes, working together formally or informally to commit the acts alleged herein.

66. The "enterprise" had a common purpose of earning revenue through their false, fraudulent, and illegal representations regarding the loan provided to QC, under the guise of a merchant cash advance, deceitfully titling the subject agreement as a "Purchase and Sale of Future Receivables," when it was actually and in substance a loan.

67. The enterprise engages in the practice of providing loans to small businesses that are seeking capital funding, and disguising the loans as merchant cash advances, while syphoning exorbitant interest rates at unlawful and usurious rates.

68. The Defendants' practices are aimed at avoiding usury laws from different states, while employing predatory lending practices and benefiting therefrom without a transfer of risk.

69. In furtherance of the deceitful and fraudulent acts, the Defendants included a choice of law clause in the loan document naming Connecticut law, which has favorable laws for the Defendants regarding usurious interest rates, despite Connecticut having no logical connection or nexus to the parties who are from New York and Florida, or to the transaction in this case which all revolves around Florida, to wit: executed by the Plaintiffs' in Florida, banking transactions, including debits by the Defendants, all occurring from a Florida bank account, the initial deposit from the Defendants being made into a Florida bank account.

70. The Defendants' intentionally, and maliciously frame their agreements in such a way as to avoid liability for usury, with the intent of charging usurious interest rates which in New York and Florida would be usurious.

71. The Defendants also intentionally and maliciously cloak their agreements as merchant cash advance agreements, when the substance of the agreements create a loan, as part of a scheme to keep the agreements out of the reach of Usury laws and deceive the borrowers such as Plaintiffs' herein.

72. The Defendants' engage in the lending practices in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding consumers, including Plaintiffs, and collecting on an unlawful debt.

73. The Defendants employ false representations, fraudulent conduct, and deceptive business practices in procuring loans clothed as merchant cash advances, and then use strong arm and extortive tactics to collect on the illegal debts.

74. In further deceptive practices to prey on and attract small businesses encountering financial hardship, the Defendants' advertising puts them out as lenders, offering high risk lending.

75. The Defendants all collectively participated in the enterprise through a pattern of racketeering activity, including but not limited to, the rendering of usurious loans and collection thereon.

  WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for civil damages, treble damages, punitive damages, interest, costs, attorneys' fees, and any further relief the Court deems just and proper.

## COUNT IV

### Violation of Chapter 542, Florida Antitrust Act of 1980, Combinations Restricting Trade or Commerce

76.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

77.     This is an action against Defendants for their violation of the Florida Antitrust Act of 1980, §§542.18 & 542.19, Florida Antitrust Act of 1980

78.     After the Plaintiffs paid off the subject loan, the Defendants continued efforts to enter into a new financial agreement with the Plaintiffs, and were aware that the Plaintiffs were seeking new financing from other sources.

79.     After the Plaintiffs paid off the subject loan, they engaged in negotiations and building relationships with other financing sources for other loans or financing products.

80.     Defendants continued efforts to enter into a new financial agreement with the Plaintiffs, and had knowledge that the Plaintiffs were seeking new financing from other sources.

81.     During the end of June and beginning of July, subsequent to having paid off the debt with the Defendants, the Plaintiffs made several requests for a confirmation letter from the Defendants confirming that the subject debt had been paid off, and that there remained a "$0.00" balance with the Defendants.

82.     The Defendants combined and/or conspired to prevent or interfere with Plaintiffs' business relationships and efforts to obtain other financing subsequent to paying off their debt with Defendants, and furthered their conspiracy by knowingly and intentionally failing to provide a requested letter of confirmation that the debt had been paid off, and that there remained a "$0.00" balance with Defendants.

83.     The Defendants' knew or should have known that failing to provide the requested payoff confirmation letter would impede any transactions with other lenders, and would possibly force the Plaintiffs to seek future financing with Defendants.

84.     The Defendants' actions were an effort or attempt to monopolize trade or commerce in this state between the Plaintiffs and other lenders, in violation of §542.19, Florida Antitrust Act of 1980.

85.     The Defendants' actions caused the Plaintiffs' to be denied or unable to obtain other financing, and damaged their business relationship with other financing companies.

86.     The Defendants' actions result in a restraint of trade or commerce, in violation of §542.18, Florida Antitrust Act of 1980.

87.     The Defendants' conduct and actions have a substantial effect on commerce within the State of Florida, and impact the Plaintiffs as consumers, as well as similarly situated consumers within the State.

88.     The Plaintiffs have been directly harmed by the Defendants' conduct and actions, and have been damaged as a result of Defendants' actions.

        WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, treble damages, interest, costs, attorney's fees, and any further relief the Court deems just and proper.

## **COUNT V**

**Violation of Sherman Act, 15 U.S.C. Sections 1 et seq. (Federal Antitrust Law)**

89.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

90.     This is an action against Defendants for their violation of 15 U.S.C. §§1 & 2, of the Sherman Act, pursuant to Sec. 4, of the Clayton Act, 15 U.S.C. §§12, et seq.

91.     Plaintiffs have standing to raise a cause of action for violation of the Sherman act, and are entitled to treble damages.

92.     After the Plaintiffs paid off the subject loan, the Defendants continued efforts to enter into a new financial agreement with the Plaintiffs, and were aware that the Plaintiffs were seeking new financing from other sources.

93.     After the Plaintiffs paid off the subject loan, they engaged in negotiations and building relationships with other financing sources for other loans or financing products.

94.     Defendants continued efforts to enter into a new financial agreement with the Plaintiffs, and had knowledge that the Plaintiffs were seeking new financing from other sources.

95.     During the end of June and beginning of July, subsequent to having paid off the debt with the Defendants, the Plaintiffs made several requests via telephone, email, text and/or certified mail, for a confirmation letter from the Defendants confirming that the subject debt had been paid off, and that there remained a "$0.00" balance with the Defendants.

96.     The Defendants combined and/or conspired to prevent or interfere with Plaintiffs' business relationships and efforts to obtain other financing subsequent to paying off their debt with Defendants, and furthered their conspiracy by knowingly and intentionally failing to provide a requested letter of confirmation that the debt had been paid off, and that there remained a "$0.00" balance with Defendants.

97.     The Defendants' knew or should have known that failing to provide the requested payoff confirmation letter would impede any transactions with other lenders, and would possibly force the Plaintiffs to seek future financing with Defendants.

98.     The Defendants' actions were an effort or attempt to monopolize trade or commerce in this state between the Plaintiffs and other lenders, in violation of 15 U.S.C. §2, Sherman Act.

99.     The Defendants' actions caused the Plaintiffs' to be denied or unable to obtain other financing, and damaged their business relationship with other financing companies.

100.     The Defendants' actions result in a restraint of trade or commerce, in violation of 15 U.S.C. §1, Sherman Act.

101.     The Defendants' conduct and actions have a substantial effect on commerce within the State of Florida, and impact the Plaintiffs as consumers, as well as similarly situated consumers within the State.

102.     The Plaintiffs have been directly harmed by the Defendants' conduct and actions, and have been damaged as a result of Defendants' actions.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, treble damages, interest, costs, attorney's fees, and any further relief the Court deems just and proper.

## COUNT VI

### Violation of Florida Unfair and Deceptive Trade Practices Act ("FDUTPA")

103.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

104.     Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

105.     Plaintiffs are "consumers" within the meaning of Fla. Stat. § 501.203(7).

106.    By soliciting loan transactions, under the misrepresented guise of merchant cash advances deceptively titled as Sale and Purchase of Future Receivables, the Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. § 501.203(8).

107.    While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretation of these terms. The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

108.    The federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers and have defined an "unfair trade practice" as any act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

109.    The Defendants' acts and omissions of representing to Plaintiffs that, among other things:

a.      QC would receive the $100,000 it bargained for;

b.      The loan was not a loan, and had no interest, when all the characteristics and substance of the transaction was a loan, resulting in an extremely high implied interest rate;

c.      That the transaction was only a purchase and sale of future receivables, while maintaining collection remedies that covered more than the mere receivables;

d.      That the default remedies had the far reaching affect of exposing the guarantors and their assets to liability for QC's inability or failure to pay on the receivables,

constituted both deceptive and unfair trade practices because the false representations and omissions made by the Defendants have a tendency or capacity to deceive consumers, such as

Plaintiffs, into accepting a loan clothed as a merchant cash advance as a means of avoiding usurious interest rates, which is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, as the Plaintiff.

110.    As a result of the Defendants' deceptive trade practices, Plaintiffs were deceived into entering the loan agreement with a company that functioned solely as an engine of fraud – thus causing significant economic damage to Plaintiffs.

111.    The materially false statements and omissions as described above, and the fact that this was a misleading loan transaction disguised as a merchant cash advance, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs which would have likely deceived a reasonable person under the circumstances.

112.    As a result of the false representations and violations of law described above, Plaintiffs have been damaged.

113.    Therefore, Plaintiffs engaged in unfair and deceptive trade practices in violation of Fla. Stat. § 501.201 *et seq*.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, punitive damages, interest, costs, attorneys' fees, and any further relief the Court deems just and proper.

## COUNT VII

### Breach of Contract

114.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

115.    The agreement of the parties required Dash to deposit or pay unto QC $100,000 (the "Purchase Price") upon execution of the Agreement.

116.    The deposit of $50,000 by Dash to QC's account on December 11, 2023, a lesser amount than the contract required, constituted a breach of the agreement.

117.    The Plaintiffs never agreed to a partial deposit of the proceeds, nor do the terms of the contract permit same.

118.    The additional deposit of $30,000 by Dash to QC's account six (6) weeks later on or about January 24, 2024, was a continuing breach of the agreement.

119.    At no time did QC consent, agree or authorize the full payment of $100,000 to be deposited or paid at a later time than at the execution of the agreement.

120.    At no time did QC consent, agree or authorize the full payment of $100,000 to be paid in separate installments.

121.    At no time did QC agree to the charging of a usurious rate of interest in the agreement.

122.    Dash's charging and collection of an unlawful and usurious rate of interest on the loan constituted a further breach of the agreement.

123.    The breach by Dash directly caused financial strain and economic loss to the Plaintiffs.

124.    The Plaintiffs were damaged by the breach.

125.    Plaintiffs are entitled to the recovery of attorneys' fees and costs for the bringing of this action, pursuant to the agreement.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, restitution, interest, costs, attorneys' fees, and any further relief the Court deems just and proper.

## COUNT VIII

### Fraud in the Inducement

126.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

127.     Defendants, by acts of both omission and commission, made false statements and representations to the Plaintiffs concerning material facts about the subject agreement.

128.     Specifically, the Defendants' representations that they were paying a purchase price of $100,000 to Plaintiffs; that the agreement did not include interest; that the agreement was not a loan, were false, and the Plaintiff purposely omitted that it would pay the $100,000, or any amount, in separate payments spread out at different times.

129.     The Defendants intended that Plaintiffs would be induced into action by relying upon the statements of fact made to them, and the omissions of other material facts.

130.     In the course of entering into what amounts to a loan, the Plaintiffs reasonably and justifiably relied on the statements of fact, and material omissions.

131.     As a direct and proximate result of Plaintiffs' reliance, the Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, interest, costs, and any further relief the Court deems just and proper.

## COUNT IX

### Common Law Fraud

132.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

133.    The Defendants represented as fact that the transaction was not a loan, and carried no interest.

134.    The Defendants represented that it would pay to Plaintiffs a purchase price of $100,000.

135.    The Defendants represented, by failing to disclose otherwise, that the $100,000 purchase price was to be paid in one payment, not divided into multiple payments at different times.

136.    The Defendants represented that the personal guarantees were only to guarantee performance of an agreement purporting to be nothing more than purchase and sale of future receivables.

137.    The Defendants' representations set out in Paragraphs 133-136 herein were false.

138.    The Defendants' representations set out in Paragraphs 133-136 herein were material, as they were germane to the intended bargain and transaction that the Plaintiffs sought.

139.    The Defendants knew or should have known that their representations set out in Paragraphs 133-136 above were false.

140.    The Defendants purposely titled the agreement and disguised it as a "Purchase and Sale of Future Receivables" to mislead the Plaintiffs, when in fact the agreement constituted a loan.

141.    Despite the mischaracterization of the agreement by the Defendants, the Defendants included personal guaranties and collateral to secure the debt, eliminating their risk in the transaction, and ensuring that the Defendants were absolutely entitled to repayment under all circumstances.

142.     The Defendants cloaked the agreement as if it were a "Purchase and Sale of Future Receivables," but still secured its absolute right to repayment by tying it in to other assets beyond the future receivables, such as "chattel paper, documents, equipment, general intangibles, instruments, and inventory" as defined under the Uniform Commercial Code, all assets that are not identified as "future receivables."

143.     The Defendants intended that their representations should be acted upon by the Plaintiffs in the way the Defendants contemplated.

144.     The Plaintiffs lacked knowledge of the falsity of Defendants' representations.

145.     The Plaintiffs relied on the truthfulness of Defendants' representations.

146.     The Plaintiffs had an inherent right to rely on Defendants' representations.

147.     The Plaintiffs were injured by reasonably relying on the Defendants' false representations.

148.     The Plaintiffs have been damaged.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, interest, costs, and any further relief the Court deems just and proper.

## COUNT X

### Negligent Misrepresentation

149.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

150.     The Defendants' misrepresentations and false promises were material to Plaintiffs who reasonably relied upon those representations and promises.

151.    The terms of the agreement contemplated a payment of the complete purchase price at the time of the agreement, and did not provide for scattered or split payments of funds to the Plaintiffs.

152.    The Agreement also included a schedule of fees, one of which was purported to be an "origination" fee, which the Defendants retained from the loan amount, totaling 15% of the purchase price "to cover cost of Origination and ACH Setup," to wit:  $15,000.  This excessive fee was misrepresented as an Origination fee to cover costs of origination and ACH Setup, items that did not cost the charged amount, and in fact constituted additional hidden interest charges.

153.    Origination fees in the market generally range from 0.50% - 1.00% of the loan amount.

154.    The Defendants knew or should have known that the purported Origination Fee was excessive and instead was a form of charging interest under a different name.

155.    Plaintiffs would not have agreed to the loan with Defendants if they had known that the entire $100,000 bargained-for purchase price was not going to be paid, or was going to be paid in scattered payments.

156.    Plaintiffs would not have agreed to the loan with the Defendants if they had known that the transaction was in substance going to result in exorbitant and usurious interest rates.

157.    Plaintiffs would not have agreed to the loan with the Defendants if they had known that there was no risk transfer, and that Plaintiffs would remain at risk as to the extent of assets beyond the mere future receivables, through the secured nature of the transaction, the personal guarantees, and the available remedies ensuring collection of the full balance of projected receivables, even if receivables never occurred.

158.    The Defendants intended that Plaintiffs would rely on their representations and promises, as they knew the Plaintiffs would believe the risk of loss was on the Defendants if the Plaintiffs' projected receivables would fall short.

159.    In reliance upon Defendants' representations and promises, Plaintiffs entered into the agreement and provided consent and access to Defendants to debit the Plaintiffs' account as Defendants' required to satisfy the full projected receivables balance under any circumstances.

160.    As a direct and proximate result of Defendants' wrongful actions, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, interest, costs, and any further relief the Court deems just and proper.

## COUNT XI

### Tortious Interference with Advantageous Business Relationship (Florida)

161.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

162.    On or about March 29, 2024, upon the request of the Plaintiffs, Dash provided QC with a payoff letter in the amount of $15,000.

163.    QC paid the $15,000 payoff balance to satisfy the loan with Dash.

164.    Subsequent to the payoff, QC has engaged in efforts to obtain new funding from other lenders, but has unable to complete those efforts due to QC's inability to provide confirmation from Dash that the debt with Dash had been paid off, and that the balance owed to Dash was $0.00, after Dash refused and/or failed to provide such confirmation following repeated requests from QC.

165.    QC has made several requests of the Defendants, via telephone, email, text and/or certified mail, to provide a letter of confirmation that the debt was paid off and that the balance owed to Dash is $0.00.

166.    The Defendants have ignored QC's requests and intentionally failed or refused to provide the requested confirmation.

167.    QC has business relationships with identifiable prospective lenders, with which it has been negotiating new loans or funding.

168.    At all times material hereto, the Defendants have had knowledge of QC's business relationships with other lenders or funders, and that QC is seeking additional funding and/or loans.

169.    The Defendants have intentionally interfered with QC's prospective business relationship, and with QC's ability to finalize other funding transactions, by unjustifiably ignoring and failing to provide QC with the requested confirmation letter.

170.    At all times material hereto, QC has had prospective legal or contractual rights with the additional lenders, which are impeded by the Defendants' interference actions.

171.    The Plaintiff has been damaged as a result of the Defendants' interference.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for damages, interest, costs, and any further relief the Court deems just and proper.

## COUNT XII

### Civil Conspiracy (Federal)

172.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

26

173.   The Defendants together established and agreed upon a course of action to earn revenues by entering into loan contracts under the guise of merchant cash advance transactions, when in fact they were loans.

174.   The loan contracts offered and executed by the Defendants imposed unlawful and usurious interest rates, in violation of Florida law.

175.   The Defendants engaged and contracted with QC and induced QC to enter into the subject loan contract disguised as a purchase and sale of future receivables.

176.   The Defendants misrepresented the true character and substance of the loan agreement with QC.

177.   Notwithstanding the foregoing, the Defendants combined and/or conspired to prevent or interfere with Plaintiffs' business relationships and efforts to obtain other financing subsequent to paying off their debt with Defendants, by knowingly and intentionally failing to provide a requested letter of confirmation that the debt had been paid off, and that there remained a "$0.00" balance with Defendants.

178.   After the Plaintiffs paid off the subject loan, the Defendants continued efforts to enter into a new financial agreement with the Plaintiffs, and were aware that the Plaintiffs were seeking new financing from other sources.

179.   The Defendants' knew or should have known that failing to provide the requested payoff confirmation letter would impede any transactions with other lenders, and would possibly force the Plaintiffs to seek future financing with Defendants.

180.   The Defendants' actions were an effort or attempt to monopolize trade or commerce in this state between the Plaintiffs and other lenders.

181.   The Defendants' actions result in a restraint of trade or commerce.

182.    The actions of the Defendants involved violation of Federal and State antitrust laws and Racketeer Influenced and Corrupt Organization Act ("RICO") laws.

183.    QC has suffered damages as a result of the Defendants' actions.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for civil damages, interest, and costs, and any further relief the Court deems just and proper.

## COUNT XIII

### Civil Conspiracy (Florida)

184.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-37 above, and further allege:

185.    The Defendants together established and agreed upon a course of action to earn revenues by entering into loan contracts under the guise of merchant cash advance transactions.

186.    The loan contracts offered and executed by the Defendants imposed unlawful and usurious interest rates, in violation of Florida law.

187.    The Defendants engaged and contracted with QC and induced QC to enter into the subject loan contract disguised as a purchase and sale of future receivables.

188.    The Defendants misrepresented the true character and substance of the loan agreement with QC.

189.    Notwithstanding the foregoing, the Defendants combined and/or conspired to prevent or interfere with Plaintiffs' business relationships and efforts to obtain other financing subsequent to paying off their debt with Defendants, by knowingly and intentionally failing to provide a requested letter of confirmation that the debt had been paid off, and that there remained a "$0.00" balance with Defendants.

190.    After the Plaintiffs paid off the subject loan, the Defendants continued efforts to enter into a new financial agreement with the Plaintiffs, and were aware that the Plaintiffs were seeking new financing from other sources.

191.    The Defendants' knew or should have known that failing to provide the requested payoff confirmation letter would impede any transactions with other lenders, and would possibly force the Plaintiffs to seek future financing with Defendants.

192.    The Defendants' actions were an effort or attempt to monopolize trade or commerce in this state between the Plaintiffs and other lenders.

193.    The Defendants' actions result in a restraint of trade or commerce.

194.    The actions of the Defendants involved violations of Federal and State Antitrust Laws and Racketeer Influenced and Corrupt Organization Act ("RICO") laws.

195.    QC has suffered damages as a result of the Defendants' actions.

WHEREFORE, Plaintiffs pray this Honorable Court enter judgment in its favor, and against the Defendants, for civil damages, interest, and costs, and any further relief the Court deems just and proper.

### Demand for Jury Trial

Plaintiff demands jury trial for all triable claims.

Dated:  July 16, 2024                    Respectfully submitted,


                                        **_/s/ Jose M. Sanchez_**
                                        Jose M. Sanchez, Esq.
                                        FBN: 0050288
                                        2001 NW 107th Avenue, Suite 250
                                        Doral, Florida 33172
                                        Tel. 786-586-7872
                                        Fax: 305-223-6127
                                        Primary Email: joses@solasitrade.com
                                        Secondary Email: jms_law@yahoo.com
                                        Attorney for Plaintiffs